(No. 92783.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. RAYMOND HARRIS, Appellee.

*Opinion filed November 20, 2003.*

FITZGERALD, J., joined by THOMAS and GARMAN, JJ., dissenting.

THOMAS, J., also dissenting.

James E. Ryan, Attorney General, of Springfield, and Jeff Tomczak, State's Attorney, of Joliet (Joel D. Bertocchi, Solicitor General, William L. Browers and Karen Kaplan, Assistant Attorneys General, of Chicago, and Norbert J. Goetten, John X. Breslin and Rita Kennedy Mertel, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

Robert J. Agostinelli, Deputy Defender, and Stephen H. Omolecki, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

At issue in this case is whether a police officer, having obtained an identification card from a passenger in a vehicle during a traffic stop, may perform a check to

determine whether there are outstanding warrants for the passenger's arrest. We hold that, under the circumstances at bar, the warrant check was outside the scope of the traffic stop and was impermissible.

## BACKGROUND

At approximately 4:30 p.m. on September 27, 1997, Officer Vernard Reed of the Will County sheriff's department, observed a vehicle, driven by Keith Weathersby, make an illegal left turn from Route 53 onto Mills Road. Officer Reed initiated a traffic stop. During the course of the traffic stop, Officer Reed requested identification from defendant, a passenger in the vehicle. Officer Reed performed a check on defendant's identification card and discovered that defendant had an outstanding warrant for failure to appear in court. Officer Reed placed defendant under arrest. In an ensuing search, officer Reed recovered a pea-sized rock of cocaine and a "Chore Boy"[1] from defendant's pocket.

Defendant was charged by indictment, in the circuit court of Will County, with the unlawful possession of a controlled substance, a Class 4 felony. 720 ILCS 570/402(c) (West 1996). He filed a motion to quash arrest and suppress evidence, arguing that Officer Reed had neither a warrant to search him nor probable cause to believe that he had committed a crime.

At a subsequent hearing on the motion, defendant testified that he was a passenger in the car stopped by Officer Reed. The officer told the driver that he had made an illegal left turn and requested identification from the driver. Sometime later, the officer approached defendant and asked him for identification. Defendant complied, giving the officer a state identification card. The officer returned to the squad car, ran a warrant check, and

---

[1]A "Chore Boy" is a scrubbing pad that can be used to heat up cocaine. The cocaine can then be smoked.

discovered that defendant had an outstanding warrant for failure to appear in court. The officer had defendant step out of the car, handcuffed defendant and searched him. Defendant stated that at no point during the stop did Officer Reed inform defendant that he wanted to see defendant's identification to determine whether defendant had a valid driver's license.

Officer Reed testified that when he first initiated the traffic stop, he requested identification from the driver of the vehicle. The driver, Keith Weathersby, stated that he did not have his driver's license on his person. The driver gave his date of birth, and identified himself as either Darren or Darryl Weathersby. Officer Reed transmitted the driver's information to county dispatch and learned there was no valid driver's license for anyone by that name. Officer Reed confronted the driver, who then gave his correct name and admitted that his license was either suspended or revoked. Officer Reed transmitted the new information to county dispatch and confirmed that Weathersby's license was suspended or revoked.

Officer Reed testified that it was his usual practice, once he determined that a driver could not legally drive, to request identification from the passengers in the car to determine whether another person could drive the car. In keeping with this practice, Officer Reed asked defendant for identification, intending to release the vehicle to defendant if defendant had a valid driver's license. At no time during the traffic stop, however, did Officer Reed ask defendant whether defendant was able to drive the car. Further, defendant's behavior had not aroused suspicion and Officer Reed did not believe that defendant had committed any wrongdoing. Having obtained defendant's identification card, Officer Reed ran the information through county dispatch and discovered that defendant had an outstanding warrant. Officer Reed advised defendant of the outstanding warrant, placed

defendant under arrest, handcuffed defendant and searched him, finding the pea-sized rock of cocaine and the "Chore Boy." Officer Reed also searched the car incident to defendant's arrest. Officer Reed found another pea-sized rock of cocaine on the back seat and arrested Weathersby.

Lastly, Officer Reed testified that an officer has the authority to arrest any person driving with a suspended license. Pursuant to such an arrest, the officer also has the authority to impound the vehicle and perform an inventory search. Officer Reed stated that he had the right to search the car once he found out that Weathersby's license was suspended.

At the conclusion of the hearing, the circuit court denied defendant's motion to quash arrest and suppress evidence. The court found that Officer Reed requested identification from defendant in order to determine whether defendant had a valid driver's license. Officer Reed intended to release the car to defendant, if defendant could legally drive the car, in order to avoid towing the vehicle. The cause proceeded to trial.

At trial, Officer Reed testified that when he activated his emergency lights, Weathersby pulled the car to the side of the road. Although Officer Reed stated that he requested identification from defendant in order to determine whether defendant could drive the vehicle, Officer Reed acknowledged that, in his police report, he stated that the car was legally parked. Officer Reed also testified that once he determined there was no valid driver's license for a Darrell Weathersby, he confronted the driver and obtained the driver's correct name. Officer Reed then turned to defendant and asked him for identification. Having obtained defendant's identification card, Officer Reed ran a check on both defendant and Weathersby. County dispatch informed him that Weathersby's license was suspended and that defendant had an

outstanding warrant. Officer Reed arrested defendant and searched him, finding the cocaine at issue. Because Officer Reed found a controlled substance on defendant, Officer Reed searched the car to see if it also contained drugs. Officer Reed explained, however, that in the absence of a passenger eligible to drive the vehicle, he would have done an inventory search of the vehicle and recovered the cocaine from the back seat.

The jury found defendant guilty of unlawful possession of a controlled substance. Subsequently, the circuit court sentenced defendant to 28 days in jail with credit for 28 days previously served and to a term of probation for 24 months. The court also ordered defendant to pay court costs and certain fines.

Defendant appealed, arguing that the circuit court should have granted the motion to quash arrest and suppress evidence. The appellate court agreed. The court held that defendant did not voluntarily comply with Officer Reed's request for identification. Officer Reed conveyed the message that compliance with the request for identification was mandatory. Under the circumstances, no reasonable person would have felt free to disregard the officer and terminate the encounter without tendering identification. 325 Ill. App. 3d 262, 266.

We granted the State's petition for leave to appeal. 177 Ill. 2d R. 315.

## DISCUSSION

### A. Standard of Review

As an initial observation, we note that the case at bar involves only the suppression of the evidence recovered from defendant during the course of the traffic stop. We are not called upon to determine any charges pressed upon defendant pursuant to the outstanding warrant for his arrest. As noted above, the circuit court denied

defendant's motion to quash arrest and suppress evidence. Generally, a motion to suppress evidence presents mixed questions of law and fact: the trial court first weighs the evidence and determines the facts surrounding the complained-of conduct, after which it decides whether, as a matter of law, these facts constitute an unconstitutional seizure. *People v. Thomas*, 198 Ill. 2d 103, 108 (2001); *People v. Shapiro*, 177 Ill. 2d 519, 524 (1997). A reviewing court accords great deference to the factual findings of the trial court. *Thomas*, 198 Ill. 2d at 108. However, the reviewing court considers *de novo* the trial court's ultimate determination to grant or deny the defendant's motion to suppress. *People v. Cox*, 202 Ill. 2d 462, 466 (2002); *Thomas*, 198 Ill. 2d at 108; *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001).

### B. Identification/Warrant Check

The State argues that defendant was not seized during the course of the traffic stop and defendant was free to decline Officer Reed's request for identification. According to the State, defendant's compliance with the officer's request was voluntary and evinced a desire to cooperate with the officer's community caretaking function. Defendant counters that for the duration of the traffic stop both he and Weathersby were detained, and the traffic stop had not come to an end when Officer Reed requested defendant's identification. Thus, defendant reasonably believed that compliance with Officer Reed's request was necessary.

In *People v. Gonzalez*, 204 Ill. 2d 220 (2003), we considered whether, during the course of a routine traffic stop, a police officer's request for identification from a passenger violated the federal and state constitutional prohibitions against unlawful seizures (see U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6). As an initial matter, we rejected the State's contention that the fourth amendment was not implicated because the police of-

ficer's request for identification qualified as "community caretaking." *Gonzalez*, 204 Ill. 2d at 223-24. Citing *People v. Murray*, 137 Ill. 2d 382, 387 (1990), we noted that "community caretaking" is a label used to describe consensual police-citizen encounters that typically involve the safety of the public. *Gonzalez*, 204 Ill. 2d at 224. A "community caretaking" encounter between the police and a citizen involves no coercion or detention, and, consequently, does not violate the fourth amendment. *Gonzalez*, 204 Ill. 2d at 224. We also rejected the State's contention that the passenger was not seized during the course of the traffic stop. *Gonzalez*, 204 Ill. 2d at 224-26. We noted that "[t]he Supreme Court has characterized the temporary detention of 'individuals' during a vehicle stop by police, even if only for a brief period and for a limited purpose, as a 'seizure' of 'persons' within the meaning of the fourth amendment." *Gonzalez*, 204 Ill. 2d at 225. We concluded that a passenger in a vehicle stopped by the police is "seized" within the meaning of the fourth amendment. *Gonzalez*, 204 Ill. 2d at 226; see also *People v. Bunch*, 207 Ill. 2d 7 (2003). Further, because a traffic stop constitutes a seizure of the vehicle's occupants, the stop is subject to the fourth amendment's requirement of reasonableness. *Gonzalez*, 204 Ill. 2d at 226, citing *Whren v. United States*, 517 U.S. 806, 809-10, 135 L. Ed. 2d 89, 95, 116 S. Ct. 1769, 1772 (1996); see also *Bunch*, 207 Ill. 2d at 13.

Having disposed of the State's preliminary contentions, we considered whether the officer's request for identification from the passenger was reasonable. We noted that a traffic stop is analogous to a *Terry* investigatory stop (see *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)). *Gonzalez*, 204 Ill. 2d at 226. Consequently, a court of review judges the reasonableness of a traffic stop by reference to *Terry*'s dual inquiry. The traffic stop is deemed reasonable if the officer's ac-

tion in initiating the stop was justified and if the officer's action during the course of the stop was reasonably related in scope to the circumstances which justified the interference in the first place. *Gonzalez*, 204 Ill. 2d at 228, quoting *Terry*, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879; see also *Bunch*, 207 Ill. 2d at 14. With respect to the second inquiry, we explained:

"[A] rule governing the application of *Terry*'s scope requirement to vehicle stops cannot be so permissive as to give police complete discretion in questioning the occupants of a stopped vehicle, nor can it be so limiting that any meaningful law enforcement activities are quashed. We believe the better approach, the one that strikes the proper balance, is that expressed by Judge Murphy in his partial concurrence and partial dissent in [*United States v.*] *Holt*:

'*Terry*'s scope requirement is a common sense limitation on the power of law enforcement officers. It prevents law enforcement officials from fundamentally altering the nature of the stop by converting it into a general inquisition about past, present and future wrongdoing, absent an independent basis for reasonable articulable suspicion or probable cause. The scope doctrine does not, however, prevent officers from engaging in facially innocuous dialog which a detained motorist would not reasonably perceive as altering the fundamental nature of the stop.' *Holt*, 264 F.3d at 1240 (Murphy, J., concurring in part and dissenting in part).

Thus, in determining whether police questioning during the course of a traffic stop satisfies *Terry*'s scope requirement, we must consider, as an initial matter, whether the question is related to the initial justification for the stop. If the question is reasonably related to the purpose of the stop, no fourth amendment violation occurs. If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question. If the question is so justified, no fourth amendment violation occurs. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articu-

lable suspicion, we must consider whether, in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." *Gonzalez*, 204 Ill. 2d at 234-35.

Applying these principles to the traffic stop at issue, we held in *Gonzalez* that the stop was justified at its inception because the vehicle did not have a front license plate. *Gonzalez*, 204 Ill. 2d at 228-29. Although the officer's request for identification was not reasonably related to the initial justification for the traffic stop, we also held that the officer's request for identification was reasonable. *Gonzalez*, 204 Ill. 2d at 235-36. We observed that the request for identification did not impermissibly prolong the length of the detention. *Gonzalez*, 204 Ill. 2d at 236. Further, the request did not change the fundamental nature of the traffic stop. *Gonzalez*, 204 Ill. 2d at 236. A simple request for identification is facially innocuous. *Gonzalez*, 204 Ill. 2d at 236. It does not suggest official interrogation and is not the type of question or request that would increase the confrontational nature of the encounter. *Gonzalez*, 204 Ill. 2d at 236.[2]

As in *Gonzalez*, we reject the State's contention that defendant was not seized during the course of the traffic stop. The encounter between Officer Reed and defendant involved a detention and is not appropriately labeled as

---

[2]We note that the request for identification, a mere question, did not constitute a seizure or a search. The important consideration in *Gonzalez* was that the passenger was seized by virtue of the traffic stop, and the questioning could not impermissibly prolong the detention or change the fundamental nature of the traffic stop. *Gonzalez* is thus entirely consistent with *Cox*, 202 Ill. 2d 462, where this court determined that a traffic stop was unreasonable, without consideration as to whether the dog-sniff test at issue was a search. The principle to take from *Gonzalez* and *Cox* is that an officer's conduct during the course of a traffic stop must be reasonably related in length and scope to the initial justification for the traffic stop.

"community caretaking." The fourth amendment is implicated when a police officer detains the driver and passenger of a vehicle during the course of a traffic stop.

Because defendant was seized when the vehicle in which he was a passenger was stopped, we must determine whether the seizure was reasonable. To do so, we reference *Terry*'s dual inquiry. With respect to the first inquiry, we note that the traffic stop was justified at its inception. Officer Reed observed the vehicle, in which defendant was a passenger, make a left turn from the right-hand lane of Route 53 onto Mills Road. With respect to the second inquiry, we note that Officer Reed's request for identification was facially innocuous. Such a request gave the officer the opportunity to identify a potential witness to the traffic violation and to the officer's actions during the course of the stop, providing a certain level of protection to both the officer and the driver of the vehicle. Moreover, the request for identification, in and of itself, did not change the fundamental nature of the stop by converting it into a general inquisition about past, present and future wrongdoing. *Gonzalez*, 204 Ill. 2d at 236.

Once Officer Reed obtained the identification card, however, he proceeded to run a check to determine whether there were outstanding warrants for defendant's arrest. Thus, our review of the reasonableness of the traffic stop does not end with the request for identification, as it did in *Gonzalez*. Nevertheless, *Gonzalez* is instructive because we there emphasized that the scope inquiry into the reasonableness of the traffic stop is dependent upon both the duration of the traffic stop and the manner in which the stop is conducted. *Gonzalez*, 204 Ill. 2d at 233; see also *Bunch*, 207 Ill. 2d at 14 ("Under the second prong we consider the *length* of the detention and the *manner* in which it was carried out" (emphases in original)). With the warrant check at issue,

as with the request for identification at issue in *Gonzalez*, we must consider whether the check was related to the initial justification for the stop. If the check was reasonably related to the purpose of the stop, no fourth amendment violation occurred. If the check was not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the check. If the check was so justified, no fourth amendment violation occurred. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether, in light of all the circumstances and common sense, the check impermissibly prolonged the detention or changed the fundamental nature of the stop. See *Gonzalez*, 204 Ill. 2d at 235; *Bunch*, 207 Ill. 2d at 16.

The warrant check performed by Officer Reed was not related to the initial justification for the traffic stop. Officer Reed initiated the traffic stop because the driver made an illegal left turn. Defendant, however, was simply the front-seat passenger in the car and was not implicated in the traffic violation.[3] Thus, the warrant check was not directly related to the initial justification for the traffic

---

[3]The passenger in this case is similarly situated to the passenger in *Bunch*, 207 Ill. 2d 7. In *Bunch*, an officer observed a car come to a brief stop but did not see the car's brake lights activate. The officer initiated a traffic stop, arrested the driver because the driver could not produce a driver's license, and asked the passenger, Bunch, to exit the car and stand at the rear of the vehicle. It was approximately 1:10 in the morning, and the officer twice shined a flashlight in Bunch's face as the officer asked Bunch his name and where he was coming from. The officer observed a small, clear plastic item, containing something white, in Bunch's mouth. The officer arrested Bunch and ordered him to spit the object out of his mouth. This court affirmed the judgment of the appellate court, finding that the trial court erred in denying a motion to quash arrest and suppress evidence. In doing so, we observed that "[p]rior to being approached by [the officer], [Bunch] was simply a

stop. Further, the warrant check was not supported by a reasonable, articulable suspicion that defendant had committed or was about to commit a crime. Officer Reed neither saw nor suspected that defendant had committed any wrongdoing. Indeed, Officer Reed testified that at the time he requested defendant's identification, defendant was not doing anything suspicious and Officer Reed did not suspect defendant of committing a criminal offense. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion,

---

*passive occupant* of the car. Although the trial court indicated that the officer had 'numerous' reasons to have a conversation with [Bunch], including explaining to him the reason for the arrest and determining if [Bunch] could be an alternative driver, the questions the officer actually posed were not objectively related to either of these reasons." *Bunch*, 207 Ill. 2d at 16-17.

We note that the actions of the passenger in the present case and the passenger in *Bunch* are in sharp contrast to the actions of the passenger in *People v. Gonzalez*, 184 Ill. 2d 402 (1998). In *Gonzalez*, an officer initiated a traffic stop in a high-crime area at approximately 2:40 in the morning. As the officer exited his squad car, the passenger "abruptly" exited from the rear passenger seat. The officer ordered the passenger to stop and return to the vehicle because the officer "didn't know what [the passenger] was planning on doing." Because the passenger ignored the officer's command and continued to walk away, the officer instructed his police dog to exit the squad car and stand in the "heel" position, at which point the dog began to bark. The officer repeated his instruction to the passenger to stop and return to the vehicle. The passenger turned around, looked at the officer, and walked back to the vehicle after hesitating a few seconds. Having observed this "strange behavior," the officer asked the passenger whether he was carrying any guns, needles or knives, to which the passenger replied "yes." The officer did a "pat down," and discovered a gun inside the front waist area of defendant's pants. This court determined "it is reasonable for a police officer to immediately instruct a passenger to remain at the car, when that passenger, of his own volition, exits the lawfully stopped vehicle at the outset of the stop." *Gonzalez*, 184 Ill. 2d at 418.

we consider whether the check impermissibly prolonged the detention or changed the fundamental nature of the stop. From the record, we cannot ascertain whether the warrant check prolonged the detention. Officer Reed testified at trial that he transmitted the driver's and defendant's information to county dispatch at the same time. Some time later, county dispatch informed Officer Reed that the driver's license was either suspended or revoked. County dispatch also informed Officer Reed that defendant had an outstanding warrant. However, Officer Reed did not testify that the warrant check performed on defendant was completed before the check on the driver. The warrant check performed on defendant could well have lengthened the duration of the detention if the officer had to wait for the results of the warrant check. Under the circumstances at bar, however, regardless of the duration of the detention, the warrant check was impermissible because it changed the fundamental nature of the traffic stop. The warrant check converted the stop from a routine traffic stop into an investigation of past wrongdoing by defendant. As Justice Murphy aptly observed in *Holt*,

> "*Terry*'s scope requirement is a common sense limitation on the power of law enforcement officers. It prevents law enforcement officials from fundamentally altering the nature of the stop by converting it into a general inquisition about past, present and future wrongdoing, absent an independent basis for reasonable articulable suspicion or probable cause." *United States v. Holt*, 264 F.3d 1215, 1240 (10th Cir. 2001) (Murphy, J., concurring in part and dissenting in part).

In *Gonzalez*, 204 Ill. 2d at 229, we acknowledged the divergence of opinion among the federal and state courts regarding the propriety of police questioning during a traffic stop. We noted that some jurisdictions look only to the length of the detention in determining the propriety of police questioning during the traffic stop. *Gonzalez*, 204 Ill. 2d at 230-31. We chose, however, to emphasize

that the manner in which the traffic stop is conducted is an important consideration in determining the reasonableness of the stop. *Gonzalez*, 204 Ill. 2d at 233. As in *Gonzalez*, we acknowledge the tempestuous discourse in foreign jurisdictions as to whether a police officer can either request identification from a passenger or perform a check for outstanding warrants for the passenger's arrest using information obtained from the passenger. *E.g.*, compare *People v. Jackson*, 39 P.3d 1174 (Colo. 2002) (evidence suppressed because police officer retained passenger's identification, instructed passenger to remain in vehicle and performed warrant check on passenger); *Spikes v. State*, 323 S.C. 28, 31, 448 S.E.2d 560, 563 (1994) (evidence suppressed where passenger was detained for 20 minutes while the officers "went fishing" for evidence of some crime); *Holt v. State*, 227 Ga. App. 46, 487 S.E.2d 629 (1997); *Commonwealth v. Alvarez*, 44 Mass. App. 531, 692 N.E.2d 106 (1998); *Hornberger v. American Broadcasting Cos.*, 351 N.J. Super. 577, 799 A.2d 566 (2002) (compiling cases); with *State v. Higgins*, 884 P.2d 1242, 1245 n.2 (Utah 1994) (the officer could perform a warrant check because the passenger consented to drive the car, and the warrant check did not significantly extend "the period of time reasonably necessary to run" a check on the passenger's driver's license); *State v. Johnson*, 805 P.2d 761 (Utah 1991) (not within the scope of the traffic stop to do a warrant check on the passenger where the passenger had denied having a license); *State v. Mennegar*, 114 Wash. 2d 304, 787 P.2d 1347 (1990) (a traffic stop does not involve an arrest or seizure of the passenger; as part of a police officer's community caretaking function, the officer may ask a passenger if the passenger wishes to drive an intoxicated driver's vehicle and may run a check on the passenger's information); *State v. Larson*, 93 Wash. 2d 638, 611 P.2d 771 (1980) (a police stop based on a parking violation

committed by the driver did not reasonably provide the officer with grounds to require identification of passengers unless other circumstances gave the police independent cause to question them); and with *State v. Landry*, 588 So. 2d 345, 348 (La. 1991) ("While the request for information (or perhaps even the removal from the car) may not have been reasonable if the officers had stopped a lone person on a college campus in broad daylight, the circumstances of the traffic stop in the present case made the request for identification from the two men reasonable"); *People v. O'Neal*, 32 P.3d 533 (Colo. App. 2000) (an officer's request for a passenger's name was part of a consensual interview; once the officer had reason to believe that the passenger had given a false name, the officer could conduct the investigatory stop which led to the discovery of the outstanding warrants); *State v. Chagaris*, 107 Ohio App. 3d 551, 669 N.E.2d 92 (1995) (having obtained a passenger's identification information, the police officer could perform a warrant check because any questioning which occurred during the detention, even if unrelated to the scope of the detention, was valid so long as the questioning did not improperly extend the duration of the detention). We continue to adhere, however, to our analysis in *Gonzalez* that the length and scope of the detention must both be considered in determining the reasonableness of the traffic stop. Having applied the *Gonzalez* framework and considered both prongs of the *Terry* dual inquiry, we conclude that Officer Reed exceeded the proper scope of the traffic stop when he retained defendant's identification card and performed a check for outstanding warrants for defendant's arrest.

By our opinion today, we do not intimate that warrant checks are always improper. As we acknowledged in *Gonzalez*, 204 Ill. 2d at 234-35, "a rule governing the application of *Terry*'s scope requirement to vehicle stops

cannot be so permissive as to give police officers complete discretion in questioning the occupants of a stopped vehicle, nor can it be so limiting that any meaningful law enforcement activities are quashed." Circumstances may arise during a routine traffic stop that focus suspicion upon the passenger. The police officer may have a reasonable, articulable suspicion that the passenger has committed a crime, in which case a warrant check may be proper. See, *e.g.*, *Commonwealth v. Sinforoso*, 434 Mass. 320, 749 N.E.2d 128 (2001). The passenger's conduct may cause the officer to fear for his safety.[4] We also do not address the situation where the passenger has violated a traffic law, such as riding in a car with an open container of alcohol. See 625 ILCS 5/11—502(b) (West 2000); *United States v. Henderson*, 229 F. Supp. 2d 35 (D. Mass. 2002). Lastly, we distinguish the facts of the present case from a situation where the driver and passenger, knowing that the driver is being arrested or is otherwise incapable of driving, agree that the passenger should drive the vehicle. See, *e.g.*, *Higgins*, 884 P.2d at 1242.

---

[4]Like the dissenting justices, the court recognizes that concerns about officer safety are "legitimate and weighty." *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 54 L. Ed. 2d 331, 336, 98 S. Ct. 330, 333 (1977). The court is mindful about the safety of officers in every situation where danger is present, as our case law aptly demonstrates. Today's ruling does not, in any way, alter our commitment to the safety of those entrusted to protect the public. In this case, we must emphasize that there was no testimony from Officer Reed regarding safety concerns. Moreover, we have made clear that a different set of factual circumstance may well yield a different conclusion based on safety concerns. Thus, while we share the anxiety of our dissenting colleagues over the number of officers killed during traffic stops, we simply cannot allow the understandable emotional reaction to such numbers to cloud our legal analysis, or ignore, as those in dissent appear to do, the fact that Officer Reed did not fear for his safety in this case.

## C. Inevitable Discovery

The State argues that the evidence recovered from defendant should not be suppressed because the evidence would have been discovered independently of the warrant check and the ensuing search of defendant's person. According to the State, Officer Reed would have performed an inventory search of the vehicle; Officer Reed would have discovered the pea-sized rock of cocaine in the vehicle; Officer Reed would have searched defendant, as an occupant of a vehicle containing cocaine; and Officer Reed would have found the evidence on defendant's person which is the subject of this motion to suppress.

Defendant counters that the inevitable-discovery doctrine requires a showing of much more than the possibility that an inventory search would have been conducted. According to defendant, the State must show that a proper inventory search would have occurred, leading to the discovery of evidence. Defendant argues the State has not met its burden of showing that Officer Reed would have arranged for the vehicle to be towed and would have performed an inventory search. Defendant also maintains that the State has failed to show that defendant would have been in or near the vehicle at the time of an inventory search.

Pursuant to the inevitable-discovery doctrine, "evidence obtained in violation of an accused's constitutional rights and which otherwise would be inadmissible at trial may be admitted if the prosecution is able to show that the evidence 'would inevitably have been discovered without reference to the police error or misconduct.' " *People v. Edwards*, 144 Ill. 2d 108, 142 (1991), quoting *Nix v. Williams*, 467 U.S. 431, 448, 81 L. Ed. 2d 377, 390, 104 S. Ct. 2501, 2511 (1984). The rationale for the inevitable-discovery doctrine is that "while 'the prosecution is not to be put in a better position than it would have been in if no illegality had transpired,' the prosecution should not be put 'in a worse position simply because

of some earlier police error or misconduct.' " (Emphasis omitted.) *People v. Burnidge*, 178 Ill. 2d 429, 437 (1997), quoting *Nix*, 467 U.S. at 443, 81 L. Ed. 2d at 387, 104 S. Ct. at 2508. Speculation and assumption will not support application of the inevitable-discovery doctrine.

In the present case, without addressing the propriety of the inventory search conducted, we decline to apply the inevitable-discovery doctrine. We agree with the appellate court that the chain of events presupposed by the State for application of the doctrine is simply too tenuous. It strains the imagination to assume that, once Officer Reed told defendant the car would be towed, defendant would have stayed for the duration of the inventory search. It is a further stretch to assume that, upon discovery of the pea-sized rock of cocaine in the back seat of the vehicle, Officer Reed would have searched defendant, the front seat passenger, in the belief that defendant possessed cocaine. In that regard we note that the State charged only the driver of the vehicle with possession of the cocaine found in the vehicle. A court must not apply the inevitable-discovery doctrine "upon the basis of nothing more than a hunch or speculation as to what otherwise might have occurred." 5 W. LaFave, Search & Seizure § 11.4(a), at 247 (3d ed. 1996).

## CONCLUSION

In reaching our conclusion, we note that the case at bar involved only the suppression of the evidence recovered from defendant during the course of the traffic stop. We were not called upon to determine the validity of any charges pressed upon defendant pursuant to the outstanding warrant for his arrest. We also note that the warrant check performed by Officer Reed was not related to the initial justification for the traffic stop, that is, the illegal left turn the driver made. Further, the warrant check was not supported by a reasonable, articulable suspicion that defendant had committed or was about to

commit a crime. Officer Reed neither saw nor suspected that defendant had committed any wrongdoing. Lastly, as noted above, a warrant check may be appropriate where a passenger's conduct causes the officer to fear for his safety. However, in the present case, Officer Reed did not testify to any safety concerns. Nor was there any intimation that the warrant check was "a precautionary measure to afford a degree of protection to the officer." *Mimms*, 434 U.S. at 110, 54 L. Ed. 2d at 336, 98 S. Ct. at 333. Instead, Officer Reed testified that he requested identification from defendant and performed the warrant check because he wanted to release the car to defendant. These facts indicate that Officer Reed neither feared for his own safety nor for that of the general public. Under the circumstances, we conclude that the warrant check changed the fundamental nature of the traffic stop. The detention was unreasonable and the circuit court should have suppressed the evidence recovered from defendant's person. Accordingly, we affirm the judgment of the appellate court reversing the circuit court's denial of defendant's motion to suppress.

*Appellate court judgment affirmed.*

JUSTICE FITZGERALD, dissenting:

The majority holds that, under the facts of this case, Officer Reed could not lawfully run a routine check for outstanding warrants, after he lawfully obtained identification from the passenger of a lawfully stopped vehicle. In reaching this conclusion, the majority purportedly relies on this court's recent decision in *People v. Gonzalez*, 204 Ill. 2d 220 (2003). In *Gonzalez*, we made clear that common sense was not to be abandoned in determining what is "reasonable" in the context of a vehicle stop. *Gonzalez*, 204 Ill. 2d at 234-35. Today, the majority not only abandons common sense, but distorts fundamental principles of fourth amendment jurisprudence.

In *Gonzalez*, we held that, in judging the reasonable-

ness of police questioning during a vehicle stop, where the questioning was neither related to the purpose of the stop nor justified by a reasonable, articulable suspicion of criminal conduct, "we must consider whether, in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." *Gonzalez*, 204 Ill. 2d at 235. The majority first speculates that the warrant check in the present case "could well have lengthened the duration of the detention." 207 Ill. 2d at 528. Constrained, however, by the absence of argument or evidence to that effect, the majority concludes that the warrant check "changed the fundamental nature of the traffic stop" by converting it into "an investigation of past wrongdoing by defendant." 207 Ill. 2d at 528. The majority's analysis and ultimate conclusion fails to recognize that not all police conduct is created equal. That is, the majority opinion overlooks the significant difference between the police conduct at issue in *Gonzalez*—a face-to-face exchange between a police officer and a detained passenger—and the police conduct at issue in the present case—an unobtrusive check of information that is part of the public record. Consideration of this difference leads to the inescapable conclusion that Officer Reed did not exceed the bounds of the fourth amendment when he checked for outstanding warrants.

Roadside questioning by police of the passenger of a stopped vehicle can take many forms—from the totally benign to the highly intrusive. At the one extreme, an officer's questions may constitute nothing more than casual banter that elicits a neutral response. At the other extreme, an officer's questions may approach something akin to official interrogation that invites, or even compels, an incriminating response, possibly on matters divorced from the stop and unsupported by any newly aroused suspicion. The degree of intrusiveness permitted

by the fourth amendment was the question we took up in *Gonzalez*. There, we were called upon to determine whether an officer's request for identification from the passenger of a lawfully stopped vehicle offends fourth amendment principles in the absence of a particularized suspicion of criminal conduct. In short, did the officer go too far?

In deciding this issue, we necessarily balanced the need for effective law enforcement, on the one hand, against the need to safeguard the privacy and security of passengers against arbitrary governmental invasions, on the other hand. *Gonzalez*, 204 Ill. 2d at 225, 234-36. We ultimately concluded that the officer's mere request for identification from the passenger was facially innocuous, did not suggest official interrogation, and was not the type of request that would increase the confrontational nature of the encounter, thus changing the stop in some fundamental way. We held that the officer's conduct did not make the otherwise lawful detention of the passenger unreasonable within the meaning of the fourth amendment. *Gonzalez*, 204 Ill. 2d at 235-36.

The police conduct at issue in the present case stands in stark contrast to the conduct at issue in *Gonzalez*. A warrant check is simply a computerized retrieval of information in the public record—information which indicates whether a court has entered a written order commanding the arrest of a specific person. See 725 ILCS 5/107—1 (West 2002). Thus, a warrant check is never intrusive in the way that police questioning of a detained passenger can be. A warrant check involves no face-to-face exchange and does not even require the passenger's participation. It is never inquisitorial, confrontational, or suggestive of official interrogation. It does not invite, much less compel, an incriminating response. Further, the passenger has no reasonable expectation of privacy in the information retrieved during a warrant check,

whether the police suspect the passenger of criminal activity or not. Accordingly, unless the warrant check impermissibly prolongs the passenger's detention—which was not the case here—no fourth amendment concerns arise.

I recognize that where the identity of the passenger is unknown, the officer cannot run a check for outstanding warrants unless the passenger assents to the officer's request for identification and permits this initial *de minimis* intrusion on his or her privacy. A warrant check, however, represents no further intrusion on the passenger's rights. Thus, if, under *Gonzalez*, a police officer may lawfully request identification from the passenger of a stopped vehicle, the additional step of a warrant check, without more, does not somehow change the "fundamental nature of the stop."

Stated another way, if a police officer lawfully detains a passenger like defendant by lawfully stopping the vehicle in which he is riding; lawfully obtains the passenger's identification; conducts a check for information in which the passenger can claim no privacy interest (information which even the majority could not seriously contend should be unavailable to police); does not require the passenger to implicate himself in possible criminal wrongdoing (as would, for example, a series of pointed questions irrelevant to the stop); does not intrude any further on the passenger's privacy or security (as would, for example, a search of his person or property); and does so without unnecessarily prolonging the passenger's detention, *in what conceivable way have the passenger's fourth amendment rights been compromised? Where is the governmental intrusion?*

Under the majority's reasoning, even if Officer Reed was acquainted with the passenger and made no request for identification, he would have been prohibited from running a warrant check. The absurdity of this proposi-

tion is manifest. Thus, the majority opinion achieves what we sought to avoid in *Gonzalez*: "stripping any notion of common sense out of the 'reasonableness' equation." *Gonzalez*, 204 Ill. 2d at 234. As we stated, "Although our legal system is steeped with rules, standards, and formulas, logic and common sense should be no less a part of it." *Gonzalez*, 204 Ill. 2d at 234.

Moreover, the majority opinion makes no attempt to balance the competing governmental and individual interests that lie at the heart of fourth amendment analysis and drove our analysis in *Gonzalez*. See *Gonzalez*, 204 Ill. 2d at 224-25, 233-35, citing *Delaware v. Prouse*, 440 U.S. 648, 654, 59 L. Ed. 2d 660, 667-68, 99 S. Ct. 1391, 1396 (1979); *Illinois v. McArthur*, 531 U.S. 326, 331, 148 L. Ed. 2d 838, 848, 121 S. Ct. 946, 950 (2001). Instead, the majority establishes a new rule of fourth amendment jurisprudence that prohibits police from engaging in one of the most basic law enforcement techniques with no explanation other than the simple statement that it constitutes an "investigation of past wrongdoing." 207 Ill. 2d at 528. Nowhere in *Gonzalez* did we intimate that police should be barred from performing enforcement and investigatory functions. That is, after all, precisely what police do. What we said, in determining the acceptable parameters of police questioning during a routine traffic stop, is that police cannot conduct a " 'general inquisition about past, present and future wrongdoing,' " absent a reasonable, articulable suspicion. *Gonzalez*, 204 Ill. 2d at 235, quoting *United States v. Holt*, 264 F.3d 1215, 1240 (10th Cir. 2001) (Murphy, J., concurring in part and dissenting in part). Conducting a non-intrusive computerized check to determine if a judge has commanded the arrest of the passenger cannot reasonably be deemed a "general inquisition." The majority's conclusion to the contrary effectively creates a constitutional right to avoid justice.

The majority opinion also calls into question this court's decision in *People v. Cox*, 202 Ill. 2d 462 (2002). In *Cox*, we stated, without qualification, that an officer may conduct a speedy warrant check on the driver of a stopped vehicle. *Cox*, 202 Ill. 2d at 468, citing *People v. Ortiz*, 317 Ill. App. 3d 212, 220 (2000); *People v. Easley*, 288 Ill. App. 3d 487, 491 (1997); *People v. Koutsakis*, 272 Ill. App. 3d 159, 163 (1995). The appellate court cases cited in *Cox* for this proposition did not expound on this point, and no specific justification for permitting a warrant check on the driver of a stopped vehicle was offered. The reason, perhaps, is that there is nothing inherently objectionable about such an investigative technique. See 4 W. LaFave, Search & Seizure § 9.2(f), at 51-58 (3d ed. 1996). Today, the majority holds otherwise.

Under the court's present analysis, a warrant check will only comport with *Terry*'s scope requirement if it is either related to the purpose of the stop, or supported by a reasonable, articulable suspicion of criminal conduct. A warrant check, however, will rarely, if ever, relate to the purpose of a routine traffic stop—issuing a warning or citation for an observed traffic violation. Nor will facts necessarily develop during a routine stop providing a reasonable, articulable suspicion of criminal conduct. Although the present case involves a passenger, rather than the driver, the same *Terry* principles that govern the reasonableness of the officer's encounter with the passenger, also govern the reasonableness of the officer's encounter with the driver. Accordingly, under the majority's opinion, a driver can now legitimately argue that a warrant check "change[s] the fundamental nature of the traffic stop" by converting the stop "into an investigation of past wrongdoing." 207 Ill. 2d at 528. Once again, the absurdity of the majority's position is evident.

Finally, I am compelled to comment on the majority's conclusion that because Officer Reed did not testify that

he feared for his own safety, considerations of officer safety should not color our analysis in this case. 207 Ill. 2d at 534. Officer safety is *always* at issue during a vehicle stop. Decades ago, the United States Supreme Court recognized that a state's concern for officer safety during a traffic stop is "both legitimate and weighty." *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 54 L. Ed. 2d 331, 336, 98 S. Ct. 330, 333 (1977). The Court cited the high incidence of police shootings when an officer approaches a suspect seated in an automobile, as well as the significant percentage of murders of police officers during traffic stops. *Mimms*, 434 U.S. at 110, 54 L. Ed. 2d at 336-37, 98 S. Ct. at 333; see also *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996) (acknowledging "the tragedy of the many officers who are shot during routine traffic stops each year"); *In re Arturo D.*, 27 Cal. 4th 60, 85 n.23, 38 P.3d 433, 450 n.23, 115 Cal. Rptr. 2d 581, 600 n.23 (2002) ("Nationwide, 13 law enforcement officers feloniously were killed while enforcing traffic laws in the year 2000," and that same year "6,234 officers were assaulted during traffic pursuits and stops"), citing FBI, Uniform Crime Reports, Law Enforcement Officers Killed and Assaulted, at 28, 83 (2000); *State v. Richards*, 201 Wis. 2d 845, 875, 549 N.W.2d 218, 230 (1996) (Abrahamson, J., concurring) ("From 1978-94 about twice as many officers were killed in traffic pursuits or stops as were killed in arrest situations involving drug-related matters"), citing U.S. Dept. of Justice Hindelang Criminal Justice Research Center, 1994 Sourcebook of Criminal Justice Statistics, at 357; *State v. Lund*, 119 N.J. 35, 37, 573 A.2d 1376, 1377 (1990) ("One study of State Police officers killed nationwide in the line of duty from September 1976 to September 1982, shows that 40 percent of the troopers killed by gunfire were fatally wounded while making traffic stops").

More recently, the Court has recognized that the pos-

sible sources of harm to an officer increase where a passenger is present. *Maryland v. Wilson*, 519 U.S. 408, 413, 137 L. Ed. 2d 41, 47, 117 S. Ct. 882, 885 (1997). This court, until today, has also considered the risk of harm to a police officer during a routine traffic stop in determining the permissible scope of the officer's authority with respect to the passenger. See *People v. Gonzalez*, 184 Ill. 2d 402, 418 (1998) (concluding that the public interest in officer safety outweighs the potential intrusion to the passenger's liberty interest in being ordered to remain at the scene). The majority's present stance, that officer safety cannot be at issue unless the officer testifies to a subjective fear, is unjustified under the case law, totally divorced from reality, and does a grave disservice to police officers.

In a footnote, the majority purports to recognize the legitimacy of concerns over officer safety. 207 Ill. 2d at 531 n.4. The majority nonetheless denigrates the dissenters' concerns, characterizing them as nothing more than an "emotional reaction" which we have allowed to "cloud" our judgment in this case. 207 Ill. 2d at 531 n.4. I freely admit that the number of police officers killed each year during traffic stops strikes a very real emotional chord. How could it not? The suggestion, however, that I, and my colleagues in dissent, have elevated emotion over legal analysis is at best unfounded, and at worst a poor attempt to direct attention away from the other significant flaws in the majority opinion.

As set forth above, the majority opinion misrepresents this court's holding in *Gonzalez*, 204 Ill. 2d 220. Further, it distorts basic principles of fourth amendment jurisprudence. In addition, the majority opinion is inconsistent with statements the same majority made in *Cox*. In response to these observations, the majority has made no attempt to shore up its tortured fourth amendment analysis, nor any attempt to reconcile today's holding

542

with *Cox*. These are weighty and legitimate matters which the majority needs to address and which are far more significant than unwarranted suggestions that the dissenting justices are ruled by emotion.

I dissent.

JUSTICES THOMAS and GARMAN join in this dissent.

JUSTICE THOMAS, also dissenting:

In *People v. Gonzalez*, 204 Ill. 2d 220 (2003), I predicted that "[t]he lower courts and the police will find the majority's rule difficult to follow because the majority does not explain what type of questioning would change the fundamental nature of the stop." *Gonzalez*, 204 Ill. 2d at 242 (Thomas, J., specially concurring). Today's decision demonstrates that my fears were not unwarranted. Nevertheless, I agree with Justice Fitzgerald that, to the extent that a workable rule emerged from *Gonzalez*, that rule is not being applied faithfully in this case. I therefore join in Justice Fitzgerald's dissent.